# EXHIBIT M

O'Leary, Denis  1/9/2008  9:30:00 AM

**1**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

CASE NO. C07-04580 MHP

------------------------------------x

SECURITIES AND EXCHANGE COMMISSION,

            Plaintiff,

    -v-

KENT H. ROBERTS,

            Defendant.

------------------------------------x

            January 9, 2008

            9:30 a.m.

            Deposition of DENIS O'LEARY, taken by

Counsel for the Defendant, at the offices of

Cooley Godward Kronish LLP, 1114 Avenue of the

Americas, New York, New York, before Anita T.

Shemin, a Certified Shorthand Reporter and

Notary Public within and for the State of

New York.

**2**

A P P E A R A N C E S :

    UNITED STATES SECURITIES AND

        EXCHANGE COMMISSION

    Attorneys for the Plaintiff

        100 F STREET, N.W.

        Washington, D.C. 20549-4631

    BY:  MATTHEW D. STRADA, ESQ.

        STEPHEN L. COHEN, ESQ.

    COOLEY GODWARD KRONISH LLP

    Attorneys for the Defendant

        Five Palo Alto Square

        3000 El Camino Real

        Palo Alto, California 94306-2155

    BY:  NEAL STEPHENS, ESQ.

    WILSON SONSINI GOODRICH & ROSATI, P.C.

    Attorneys for the Witness

        650 Page Mill Road

        Palo Alto, California 94304-1050

    BY:  RODNEY G. STRICKLAND, JR., ESQ.

        CLAYTON BASSER-WALL, ESQ.

ALSO PRESENT:

    OSMANY CABRERA, Videographer

    KENT ROBERTS

**3**

INDEX

WITNESS        EXAMINATION BY        PAGE

Denis J. O'Leary    Mr. Stephens        6

            Mr. Cohen        236

EXHIBITS

Exhibit  67, Handwritten notes, Bates        57
SEC00237 - 239

Exhibit 68, Form re options granted to O'Leary 115

Exhibit 69, Form 8-K        133

Exhibit 70, Document, Bates MFESEC016548 - 550 138

Exhibit 71, 10/11/06 press release        143

Exhibit 72, Document, FMEUSA0016778 - 782    152

Exhibit 73, Samenuk employment agreement    154

Exhibit 74, Notes, SAMENUK 3046 - 3048    169

Exhibit 75, Form 8-K        183

Exhibit 76, 5/25/07 press release        225

Exhibit 77, Documents, MFEKRS-DOL0001 - 0153  228

Exhibit 78, Document, MFEKRS-RP00033 - 034  231

**4**

            IT IS HEREBY STIPULATED AND AGREED

by and between the attorneys for the respective

parties hereto that all rights provided by the

C.P.L.R., including the right to object to any

question, except as to the form, or to move to

strike any testimony are reserved to the trial

of this action.

            IT IS FURTHER STIPULATED AND AGREED

that this deposition may be sworn to by the

witness being examined before a Notary Public

other than the Notary Public before whom this

deposition was begun, but the failure to do

so or to return the original of this

deposition to counsel shall not be deemed a

waiver of any rights provided by the C.P.L.R.

and shall be controlled thereby.

            IT IS FURTHER STIPULATED AND AGREED

that the filing and certification of the

original of this deposition are waived.

                *  *  *  *  *

O'Leary, Denis  1/9/2008  9:30:00 AM

125

1  been made a member of McAfee's board; is that
2  correct?
3  A  That is correct.
4  Q  Okay. Would you term it a clerical error
5  when the board approves the July minutes in October,
6  and the July minutes indicate that you are starting
7  on the board effective as of July 17th?  Is that a
8  clerical error?
9  MR. COHEN:  Object to the form of the
10  question.
11  THE WITNESS:  Can I answer it?
12  A  I don't know if it was a clerical error or
13  not.  I believe that the -- that the use of the 17th
14  instead of the 15th was poor process administration
15  versus anything by design.  If you want to call that
16  clerical, I am with you on the definition of
17  clerical.  I mean, I don't know if a clerk
18  necessarily did it or whether the error was that
19  the -- that the GC should have spotted this.  I
20  can't tell you who in a management chain should have
21  spotted it, but everything I am aware of suggests to
22  me that there was no design to do this
23  intentionally.  Certainly no one -- the person who
24  would benefit from this primarily would have been me
25  monetarily if the option came into the money, and

126

1  from that standpoint, the only indirect benefit
2  would have been somebody telling me they did this
3  for me so they could get some retribution.
4  Q  And Mr. Roberts did?
5  A  And no one asked for a special deal with
6  my option.  Had they, I would have rejected them
7  immediately.  Probably would have had them fired for
8  offering.
9  Q  Has the SEC ever contacted you to ask you
10  any questions about your July 2003 option?
11  A  No, I do not believe so.
12  Q  They never suggested that they would
13  charge you with any kind of fraud regarding your
14  options?
15  A  No, they did not.
16  Q  To your knowledge, have you ever been
17  under investigation by the SEC for any actions that
18  you took regarding stock options at McAfee?
19  A  Not to my knowledge.
20  Q  And the DOJ, if I understand your prior
21  testimony, they never contacted you about anything?
22  A  No, they did not.
23  Q  Including talking about your 2003 option,
24  correct?
25  A  No

127

1  Q  So there is -- there has been no
2  suggestion from the DOJ that you would be charged
3  with any fraud or anything regarding McAfee's option
4  program and your role as a director, correct?
5  A  No.
6  Q  Have you ever considered resigning from
7  McAfee's board regarding the facts surrounding your
8  July 2003 option grant?
9  A  No.
10  Q  Has anyone ever suggested to you that you
11  should consider resigning from McAfee's board
12  regarding your July 2003 grant?
13  A  No.
14  Q  Has anyone ever suggested to you that you
15  should suffer any form of punishment at all
16  regarding the facts surrounding your 2003 option
17  grant?
18  A  No.
19  Q  When did you -- well, let me strike that,
20  and I will reask a different question.
21  When you were deposed by the SEC in June
22  of 2006, had the issue with your option been
23  identified by anybody?
24  MR. STRICKLAND:  Objection, calls for
25  speculation.

128

1  MR. COHEN:  Join and object to the form of
2  the question.
3  BY MR. STEPHENS:
4  Q  So let me reask:  To your knowledge, as
5  you sat there in June of 2006 speaking with the SEC,
6  had anyone identified any issues with or potential
7  issues with the date of your July 2003 option grant?
8  A  I don't know.
9  Q  Okay. When did you first become aware
10  that there might be an issue with your option?
11  A  Just prior to my interview with Bob
12  Gooding.  And I will have to find out exactly when
13  that was, but it was after we had formed the Special
14  Committee and just prior to a board meeting when I
15  was in California.  I became aware that some of the
16  director options may have been mispriced as they
17  were going through the work checking all of the
18  options, and that included that was my original
19  initial grant.
20  Q  Okay. And how would I tie down what that
21  date was?
22  A  I could find out when the board meeting in
23  California was that I spoke to Gooding Howrey, but
24  my guess would have been it would have been the July
25  board meeting.

129

1    Q   We have some minutes that we will go
2    through.
3    A   It wasn't at the board meeting, it was
4    while I was in California.  We met outside the board
5    meeting, they had asked to speak to myself and a
6    couple of the directors to follow up on what they
7    had found in their work on all of the options.
8    Their investigation included all of the options of
9    the company, and they met with me, and just prior to
10   that meeting, they told me they would like to meet
11   with me.  This is probably within a week of that
12   meeting.  They said they would like to meet with me
13   while I was in California to discuss this because
14   some of my options may have been mispriced.
15   Q   Okay.
16   A   That was the first time I had heard
17   anything to do with me and a problem with an option
18   price.
19   Q   Okay.  All right.  We may be able to nail
20   that down with a little bit more clarity later
21   today.
22       Going back to some of the questions that I
23   asked about the SEC and the DOJ, just more broadly,
24   to your knowledge, have you ever been under
25   investigation by any federal agency for anything?

130

1    A   No.
2    Q   Or any state agency?
3    A   No, nothing.
4    Q   Never been convicted of a crime?
5    A   I never had a parking – other than a
6    parking violation, I never had a speeding ticket in
7    my life.
8    Q   All right.  You obviously don't live in
9    Mountainview?
10   A   I do it on the track.
11       MR. STEPHENS:  I have 12:15.  Let's go off
12   the record for a second.
13       THE VIDEOGRAPHER:  The time is now 12:17.
14   We are going off the record.
15       (Luncheon recess.)
16       (Time noted:  12:17 p.m.)
17
18
19
20
21
22
23
24
25

131

1    A F T E R N O O N  S E S S I O N
2    (Time noted:  1:15 p.m.)
3    THE VIDEOGRAPHER:  The time is now 1:15,
4    and this begins Tape No. 3 in the videotaped
5    deposition of Denis O'Leary.
6    BY MR. STEPHENS:
7    Q   Mr. O'Leary, let me just go back and ask a
8    couple of follow-up questions on a couple of the
9    other topics that we spoke about.
10       One of the things that we had talked about
11   was the discussion you had with Mr. Samenuk
12   regarding the 2000 focal grant?
13   A   Yes.
14   Q   And the first conversation occurred in
15   like the late May of 2006 time frame?
16   A   Right.
17   Q   Okay.  After that conversation, did you
18   take any steps to secure any documents from
19   Mr. Samenuk that might relate to the handling of the
20   2001 option?
21   A   No.
22   Q   Okay.  Did anyone you know take his
23   computer and mirror image the hard drive at that
24   point in time?
25   A   No.

132

1    Q   Was he denied access to any of McAfee's
2    computer databases following that discussion?
3    A   Well, I should say we did take steps
4    because when we did our investigation on options,
5    everyone was included, so we asked – the scope of
6    the request that we asked internal audit and later
7    Gooding Howrey was to include everybody, every
8    option, ten years.  We didn't give anyone a pass.
9    Q   Okay.  But in late May of 2006 –
10   A   That was late May of –
11   Q   So to your knowledge –
12   A   We called Gooding Howrey the day we
13   became aware of Kent's event.
14   Q   Okay.  That day, someone took Mr. Roberts'
15   laptop, correct?
16   A   Yes.
17   Q   That day, did anyone do anything to
18   preserve any documents for Mr. Samenuk?
19   A   Not that I know of.
20   Q   The following day, did anyone do anything
21   to preserve any documents from Mr. Samenuk?
22   A   Not that I know of.
23   Q   How about two or three days later?
24   A   I am not sure when people specifically
25   preserved documents for George, but from that day

O'Leary, Denis  1/9/2008  9:30:00 AM

189

1  questions.
2  A  Yes.
3  Q  You said you got downloads or updates
4  about the process that was being conducted, correct?
5  A  That's right.
6  Q  And in those updates or downloads, they
7  would -- folks would describe who the investigators
8  for the Special Committee was talking to or
9  interviewing?
10  A  No, not in detail.  Not really, no.
11  Q  Okay, but --
12  A  It was really -- quite honestly, I had
13  very little information other than the investigation
14  is continuing, that we have at this stage reviewed X
15  gazillion documents, and we have spoken to X amount
16  of people.  Occasionally, we might have heard who
17  they had spoken to, but nothing about what that
18  person said.
19  Q  Was there any discussion as to like how
20  they set the parameters of the fence?  By that, I
21  mean what was in the investigation, what was outside
22  the investigation?  Was there any investigation
23  about more stuff should be in, less stuff should be
24  in?
25  A  The general fence was discussed.  It

190

1  wasn't so much as discussed as shared with us, and
2  we agreed that it should go as far back as possible
3  right to the present date, that it should include --
4  be all inclusive on executives, both with us and who
5  had previously been with us, and should include
6  every option granted.
7  Q  Were you ever interviewed by any of the
8  attorneys at the Howrey law firm?
9  A  Yes, I was.
10  Q  Was that a face-to-face meeting?
11  A  Yes, it was.
12  Q  Where did that take place?
13  A  Santa Clara.
14  Q  How many times were you interviewed?
15  A  Once.
16  Q  How long was the interview?
17  A  Approximately, 30 minutes.
18  Q  Did you have any -- did you have anyone
19  with you during the interview?
20  A  No, it was -- I believe it was Roman
21  Darmer and Bob Gooding from Howrey, and I was alone,
22  me and myself.
23  Q  And in the interview, what information did
24  you provide?
25  A  They asked me about --

191

1  MR. STRICKLAND:  Let's not discuss what
2  they asked on the grounds that that is -- we are
3  going to take the position that that is privileged and
4  work product, but you can generally describe the
5  content of what was the meeting.
6  A  I discussed my initial option grant and my
7  recollection of how it was granted, my recollection
8  of who, if anyone, I talked to at that time, and the
9  level of awareness I had about it being dated a
10  different date than the actual board meeting.
11  Q  How did it go about this interview got
12  scheduled on -- who handled the scheduling?
13  A  Initially, I was made aware that there
14  were some director grants that had issues to them.
15  I also believe Bob Buckham may have been
16  present at that meeting with Howrey, also --
17  Q  Okay.
18  A  -- from the Special Committee, so it might
19  have been four of us, I can't recall now.  It was
20  definitely Roman, and Bob Gooding and myself.
21  Q  Okay.
22  A  Bob Buckham may have been sitting in on it
23  as well.  I believe Bob Buckham might have been the
24  one to tell me that Howrey would like to meet with
25  me and talk about my options.

192

1  Q  And that was prior to sitting down?
2  A  It was probably several days to a week
3  prior to sitting down --
4  Q  So -- I am sorry.
5  A  -- and then the meeting when we sat down
6  was commensurate with that board meeting.
7  Q  Okay.  All right.  Did Mr. Buckham tell
8  you anything else about the need for the
9  investigations from the Special Committee to talk to
10  you?
11  A  He told me that it looked like there was a
12  mispricing on my initial grant.
13  Q  Okay.
14  A  Which, to my recollection, was I didn't
15  think there was an error on it.
16  Q  What did you tell Mr. Buckham in response?
17  A  I said I thought my grant was right on the
18  money.
19  Q  Okay.
20  A  And so I was at a loss on what could be
21  erroneous.  I checked when I got it, I knew it was
22  25,000 shares, is what the Director of Comp was.  I
23  was Director of Comp.  I believe it was done at the
24  money and approved appropriately by the board, and I
25  acknowledged it.  I felt there was no room, why do

O'Leary, Denis  1/9/2008  9:30:00 AM

205

1  the outline of his remarks.
2      Q   All right.
3      A   All right.
4      Q   So it says that there is -- in some of the
5  resolutions following extensive discussion, the
6  board passed the following resolutions. One of them
7  is the board accepting Mr. Samenuk's resignation; is
8  that accurate, that is what happened?
9      A   Yes.
10     Q   And then it talks about appointing some of
11  the directors, right?
12     A   That is right.
13     Q   Now, were you provided any guidance as to
14  the -- were you provided any guidance regarding how
15  to structure his separation agreement?
16     MR. STRICKLAND:  Object as ambiguous as to
17  timing. He testified to some earlier. Do you mean
18  something different or a different time frame?
19     Q   During this October 10th board meeting,
20  were you provided any guidance by anyone as to how
21  to structure the terms of Mr. Samenuk's separation
22  agreement?
23     A   Yes.
24     Q   By who?
25     A   We got advice from Wilson Sonsini,

206

1  particularly Jeff Saper.
2      MR. STRICKLAND:  Don't discuss the
3  content.
4      A   We asked for -- given what we had learned
5  at this meeting, we asked for advice on what our
6  options were and what would be appropriate actions
7  for a board in this situation.
8      MR. STEPHENS:  And then, Rod, so the
9  record is clear, my understanding is that you are
10  instructing the witness not to answer any questions
11  about the advice that Mr. Saper provided regarding
12  Mr. Samenuk's separation agreement at this board
13  meeting; is that right?
14     MR. STRICKLAND:  Correct.
15     BY MR. STEPHENS:
16     Q   Okay. Is it the same answer for any of
17  the advice that the Howrey law firm provided
18  regarding the special investigation?
19     A   It would be, yes.
20     Q   Okay.
21     MR. STEPHENS:  All right. So we obviously
22  disagree on that.
23     MR. STRICKLAND:  Yes, we do.
24     MR. STEPHENS:  As opposed to spending a
25  lot of time on the record, we will deal with it

207

1  later, fair?
2      MR. STRICKLAND:  Fair.
3  BY MR. STEPHENS:
4      Q   Okay. The next one is Exhibit No. 63.
5      MR. STRICKLAND:  Okay.
6      Q   And this is a board meeting on
7  October 23rd, 2006.
8      So, Mr. O'Leary --
9      A   What was the last one?
10     MR. STRICKLAND:  This is 63, the last one
11  was 62.
12     THE WITNESS:  They are both minutes of the
13  same meeting?
14     MR. STRICKLAND:  No. I am sorry.
15     THE WITNESS:  Okay, fine. This is a
16  regular board meeting.
17  BY MR. STEPHENS:
18     Q   Mr. O'Leary, you should have in front of
19  you an exhibit marked 63, which is draft minutes of
20  a board meeting held on Monday, October 23rd, 2006,
21  at -- in New York.
22     A   That is correct.
23     Q   Is that what you have in front of you?
24     A   Yes, I do.
25     Q   Okay. And you attended that meeting,

208

1  correct?
2      A   I did.
3      Q   And there was -- was this a meeting in
4  which the -- Mr. Gooding, on behalf of the Howrey
5  firm, provided or reported to the entire board about
6  the investigation?
7      A   I believe so.
8      Q   Okay. Did he provide the board with any
9  written materials to review?
10     A   No, almost throughout this, other than a
11  board book saying "Special Committee Update," and I
12  have submitted the search on those pages, almost
13  zero was written or handed out.
14     Q   Have you ever seen any PowerPoint
15  presentation?
16     A   Yes, I have.
17     Q   Was there a PowerPoint presentation used
18  at this board meeting?
19     A   At this board meeting, I don't believe so.
20  There was one in the October board meeting. I mean
21  the earlier October 10th meeting.
22     Q   Okay. The really long one?
23     A   October 10th.
24     Q   And that board meeting took place in?
25     A   In Texas.

O'Leary, Denis  1/9/2008  9:30:00 AM

209

```
1   Q  In Texas?
2   A  Yes.
3   Q  So the record is clear, at the board
4   meeting on October 10th in Plano, Texas,
5   Mr. Howrey --
6   A  Bob Gooding.
7   Q  -- Mr. Gooding of the Howrey firm provided
8   or went through a PowerPoint presentation to the
9   board to describe kind of the scope of the work that
10  they had done, where they were in the investigation;
11  is that accurate?
12  A  And their findings.
13  Q  And their findings?
14  A  Scope, process, findings.
15  Q  So it is written down in a document, it is
16  just not written down in a document that was given
17  to you at the board meeting?
18  A  Correct.
19  Q  Have you ever seen a hard copy of that
20  document?
21  A  Yes, I have.
22  Q  When did you see a hard copy of that
23  document?
24  A  My belief, early summer of '07.
25  Q  In what context?
```

210

```
1   A  I had called Bob Gooding to say I would
2   like to reread the document that was presented to --
3   the PowerPoint that was presented to us in Texas.
4   Q  Okay.  Why?
5   A  Just because between the Texas date and
6   early this summer, it was clear there was going to
7   be a fair amount of litigation around those events
8   and also significant consequences pretty much
9   expected, but nonetheless significant, were going to
10  occur, and I wanted to reread it.
11  Q  Okay.  And Mr. Gooding supplied it to you?
12  A  I was offered the opportunity to visit
13  their offices in New York.  You are an attorney,
14  this is your world.
15  Q  Let me play this out.
16  A  I was offered the opportunity -- after
17  some discussion, it was decided that the best
18  approach was for me to visit their offices in New
19  York, sit in a room, and read the document and leave
20  the room without any notes or a copy of the
21  document.
22  Q  Were you allowed to take notes at the
23  meeting?  I am sorry, were you allowed to take notes
24  during your review of the report in the Howrey
25  firm's offices?
```

211

```
1   A  No one specifically sat there and watched
2   me, but the basic agreement was or the advice from
3   counsel would be reading it is the best approach.
4   Q  Okay.  So did you take notes?
5   A  No.
6   Q  Okay.  And you had the document there in
7   front of you --
8   A  Right.
9   Q  -- in the summer of 2007, at the law
10  offices of the Howrey firm here in New York?
11  A  That is right.
12  Q  And you provided it back to them and went
13  on your way?
14  A  I literally went in, an associate provided
15  me the document in the room.  I spent an hour or so
16  rereading the document.  I closed the document and
17  went outside, handed the document back to the
18  associate and said thank you very much.
19  Q  Was the -- PowerPoint slides usually have
20  page numbers on them.  Was this one numbered?
21  A  I don't recall.
22  Q  Okay.  Do you know if there were any gaps
23  in the document?
24  A  I don't recall.
25  Q  Would you have noticed if there was?
```

212

```
1   A  I think so.  When I left, it certainly
2   seemed to me they provided me the full presentation
3   I had seen previously in Texas.
4   Q  Okay.  At their presentation in Texas, was
5   there any comment from anybody that the PowerPoint
6   presentation that was being provided to you was only
7   a portion of the document and not the full
8   PowerPoint presentation?
9   A  No.
10  Q  You thought you had the full presentation,
11  correct?
12  A  It depends.  We thought we got the full
13  presentation that was intended for the full board.
14  Q  Right?
15  A  We didn't expect that we were going to see
16  the full scope of data.
17  Q  You are not going to get the 3 million
18  e-mails, right?
19  A  Or even the briefings that the Special
20  Committee got.  The purpose of the Special Committee
21  was to do all of that work and come to the core
22  findings that were appropriate for the board to
23  review and take action on it.  So my belief was that
24  the Special Committee had reviewed with Howrey a
25  document that would be presented to the full board
```

O'Leary, Denis  1/9/2008  9:30:00 AM

241

1     Did Mr. Roberts say to you that he didn't
2  believe he should be the legal counsel any longer
3  during that conversation?
4     MR. STEPHENS:  Object to form.
5     A.  I don't recollect him saying that, no.
6     Q.  What do you recall about that topic?
7     A.  My recollection was that toward the end of
8  that discussion with him, he made some comments
9  referring to functions he could -- he could pursue
10  in the company other than general counsel, and that
11  I left the meeting with the distinct impression he
12  didn't realize he was going to be fired,
13     Q.  Do you have a specific recollection that
14  during your conversation with Mr. Roberts, he
15  apologized to you for his actions in 2000?
16     MR. STEPHENS:  Object to form.
17     A.  Absolutely.  Absolutely.
18     MR. COHEN:  I have no further questions.
19     MR. STEPHENS:  I have got no questions on
20  top of that, so from that -- from my perspective,
21  Mr. O'Leary, I thank you for taking the time today.
22     THE WITNESS:  Thank you.  Thank you,
23  gentlemen.
24     MR. COHEN:  I thank you as well.
25     THE VIDEOGRAPHER:  The time is now 3:44,.

242

1  and this concludes today's deposition of Denis
2  O'Leary on January 9th, 2008.
3     (The deposition concluded at 3:44 p.m.)

243

3     A C K N O W L E D G E M E N T
4     I, DENIS O'LEARY, hereby
5  certify, I have read the transcript of my
6  testimony taken under oath in my deposition
7  of January 9, 2008, that the transcript is
8  a true, complete and correct record of what
9  was asked, answered and said during this
10  deposition, and that the answers on the
11  record as given by me are true and correct.

13  _____
14     DENIS O'LEARY
15  Sworn and subscribed to before me
16  this_____day of_____, 2008.

18  _____
19     Notary Public

244

1     CERTIFICATE
2     OF
3     CERTIFIED SHORTHAND REPORTER
4     *   *   *

6     The undersigned Certified Shorthand
7  Reporter and Deposition Notary Public of the State
8  of New York do hereby certify:
9     That the foregoing Deposition was taken
10  before me at the time and place therein set forth,
11  at which time the Witness was duly sworn by me.
12     That the testimony of the Witness and all
13  objections made at the time of the Deposition
14  were recorded stenographically by me and were
15  thereafter transcribed, said transcript being a
16  true and correct copy of the proceedings thereof.
17     In witness whereof, I have subscribed
18  my name this date.  January 22, 2008.

20  _____
21     ANITA T. SHEMIN