# EXHIBIT M

O'Leary, Denis  1/9/2008  9:30:00 AM

**1**

```
 1              UNITED STATES DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                  SAN FRANCISCO DIVISION
 4                  CASE NO. C07-04580 MHP
 5      ----------------------------------x
 6      SECURITIES AND EXCHANGE COMMISSION,
 7                      Plaintiff,
 8          -v-
 9      KENT H. ROBERTS,
10                      Defendant.
11      ----------------------------------x
12
13                  January 9, 2008
14                  9:30 a.m.
15              Deposition of DENIS O'LEARY, taken by
16      Counsel for the Defendant, at the offices of
17      Cooley Godward Kronish LLP, 1114 Avenue of the
18      Americas, New York, New York, before Anita T.
19      Shemin, a Certified Shorthand Reporter and
20      Notary Public within and for the State of
21      New York.
22
23
24
25
```

**3**

```
 1                      INDEX
 2      WITNESS         EXAMINATION BY      PAGE
 3      Denis J. O'Leary    Mr. Stephens      6
 4                          Mr. Cohen       236
 5
 6                      EXHIBITS
 7      Exhibit 67, Handwritten notes, Bates    57
 8      SEC00237 - 239
 9      Exhibit 68, Form re options granted to O'Leary 115
10      Exhibit 69, Form 8-K                133
11      Exhibit 70, Document, Bates MFESEC016548 - 550 138
12      Exhibit 71, 10/11/06 press release      143
13      Exhibit 72, Document, FMEUSA0016778 - 782    152
14      Exhibit 73, Samenuk employment agreement   154
15      Exhibit 74, Notes, SAMENUK 3046 - 3048    169
16      Exhibit 75, Form 8-K                183
17      Exhibit 76, 5/25/07 press release       225
18      Exhibit 77, Documents, MFEKRS-DOL0001 - 0153  228
19      Exhibit 78, Document, MFEKRS-RP00033 - 034  231
20
21
22
23
24
25
```

**2**

```
 1      A P P E A R A N C E S:
 2      UNITED STATES SECURITIES AND
 3          EXCHANGE COMMISSION
 4      Attorneys for the Plaintiff
 5          100 F STREET, N.W.
        Washington, D.C. 20549-4631
        BY: MATTHEW D. STRADA, ESQ.
            STEPHEN L. COHEN, ESQ.
 6
 7      COOLEY GODWARD KRONISH LLP
        Attorneys for the Defendant
 8      Five Palo Alto Square
        3000 El Camino Real
 9      Palo Alto, California 94306-2155
        BY: NEAL STEPHENS, ESQ.
10
11
12      WILSON SONSINI GOODRICH & ROSATI, P.C.
        Attorneys for the Witness
        650 Page Mill Road
13      Palo Alto, California 94304-1050
        BY: RODNEY G. STRICKLAND, JR., ESQ.
14          CLAYTON BASSER-WALL, ESQ.
15
16      ALSO PRESENT:
17      OSMANY CABRERA, Videographer
18      KENT ROBERTS
19
20
21
22
23
24
25
```

**4**

```
 1
 2          IT IS HEREBY STIPULATED AND AGREED
 3      by and between the attorneys for the respective
 4      parties hereto that all rights provided by the
 5      C.P.L.R., including the right to object to any
 6      question, except as to the form, or to move to
 7      strike any testimony are reserved to the trial
 8      of this action.
 9          IT IS FURTHER STIPULATED AND AGREED
10      that this deposition may be sworn to by the
11      witness being examined before a Notary Public
12      other than the Notary Public before whom this
13      deposition was begun, but the failure to do
14      so or to return the original of this
15      deposition to counsel shall not be deemed a
16      waiver of any rights provided by the C.P.L.R.
17      and shall be controlled thereby.
18          IT IS FURTHER STIPULATED AND AGREED
19      that the filing and certification of the
20      original of this deposition are waived.
21
22              * * * * *
23
24
25
```

O'Leary, Denis  1/9/2008  9:30:00 AM

125

1  been made a member of McAfee's board; is that
2  correct?
3      A.  That is correct.
4      Q.  Okay.  Would you term it a clerical error
5  when the board approves the July minutes in October,
6  and the July minutes indicate that you are starting
7  on the board effective as of July 17th?  Is that a
8  clerical error?
9      MR. COHEN:  Object to the form of the
10  question.
11      THE WITNESS:  Can I answer it?
12      A.  I don't know if it was a clerical error or
13  not.  I believe that the -- that the use of the 17th
14  instead of the 15th was poor process administration
15  versus anything by design.  If you want to call that
16  clerical, I am with you on the definition of
17  clerical.  I mean, I don't know if a clerk
18  necessarily did it or whether the error was that
19  the -- that the GC should have spotted this.  I
20  can't tell you who in a management chain should have
21  spotted it, but everything I am aware of suggests to
22  me that there was no design to do this
23  intentionally, Certainly no one -- the person who
24  would benefit from this primarily would have been me
25  monetarily if the option came into the money, and

126

1  from that standpoint, the only indirect benefit
2  would have been somebody telling me they did this
3  for me so they could get some retribution.
4      Q.  And Mr. Roberts did?
5      A.  And no one asked for a special deal with
6  my option.  Had they, I would have rejected them
7  immediately.  Probably would have had them fired for
8  offering.
9      Q.  Has the SEC ever contacted you to ask you
10  any questions about your July 2003 option?
11      A.  No, I do not believe so.
12      Q.  They never suggested that they would
13  charge you with any kind of fraud regarding your
14  options?
15      A.  No, they did not.
16      Q.  To your knowledge, have you ever been
17  under investigation by the SEC for any actions that
18  you took regarding stock options at McAfee?
19      A.  Not to my knowledge.
20      Q.  And the DOJ, if I understand your prior
21  testimony, they never contacted you about anything?
22      A.  No, they did not.
23      Q.  Including talking about your 2003 option,
24  correct?
25      A.  No

127

1      Q.  So there is -- there has been no
2  suggestion from the DOJ that you would be charged
3  with any fraud or anything regarding McAfee's option
4  program and your role as a director, correct?
5      A.  No.
6      Q.  Have you ever considered resigning from
7  McAfee's board regarding the facts surrounding your
8  July 2003 option grant?
9      A.  No.
10      Q.  Has anyone ever suggested to you that you
11  should consider resigning from McAfee's board
12  regarding your July 2003 grant?
13      A.  No.
14      Q.  Has anyone ever suggested to you that you
15  should suffer any form of punishment at all
16  regarding the facts surrounding your 2003 option
17  grant?
18      A.  No.
19      Q.  When did you -- well, let me strike that,
20  and I will reask a different question.
21      When you were deposed by the SEC in June
22  of 2006, had the issue with your option been
23  identified by anybody?
24      MR. STRICKLAND:  Objection, calls for
25  speculation.

128

1      MR. COHEN:  Join and object to the form of
2  the question.
3  BY MR. STEPHENS:
4      Q.  So let me reask:  To your knowledge, as
5  you sat there in June of 2006 speaking with the SEC,
6  had anyone identified any issues with or potential
7  issues with the date of your July 2003 option grant?
8      A.  I don't know.
9      Q.  Okay.  When did you first become aware
10  that there might be an issue with your option?
11      A.  Just prior to my interview with Bob
12  Gooding.  And I will have to find out exactly when
13  that was, but it was after we had formed the Special
14  Committee and just prior to a board meeting when I
15  was in California.  I became aware that some of the
16  director options may have been mispriced as they
17  were going through the work checking all of the
18  options, and that included that was my original
19  initial grant.
20      Q.  Okay.  And how would I tie down what that
21  date was?
22      A.  I could find out when the board meeting in
23  California was that I spoke to Gooding Howrey, but
24  my guess would have been it would have been the July
25  board meeting.

O'Leary, Denis  1/9/2008  9:30:00 AM

129

1  Q  We have some minutes that we will go

2  through.

3  A  It wasn't at the board meeting, it was

4  while I was in California. We met outside the board

5  meeting, they had asked to speak to myself and a

6  couple of the directors to follow up on what they

7  had found in their work on all of the options.

8  Their investigation included all of the options of

9  the company, and they met with me, and just prior to

10  that meeting, they told me they would like to meet

11  with me. This is probably within a week of that

12  meeting. They said they would like to meet with me

13  while I was in California to discuss this because

14  some of my options may have been mispriced.

15  Q  Okay.

16  A  That was the first time I had heard

17  anything to do with me and a problem with an option

18  price.

19  Q  Okay. All right. We may be able to nail

20  that down with a little bit more clarity later

21  today.

22  Going back to some of the questions that I

23  asked about the SEC and the DOJ, just more broadly,

24  to your knowledge, have you ever been under

25  investigation by any federal agency for anything?

130

1  A  No.

2  Q  Or any state agency?

3  A  No, nothing.

4  Q  Never been convicted of a crime?

5  A  I never had a parking -- other than a

6  parking violation, I never had a speeding ticket in

7  my life.

8  Q  All right. You obviously don't live in

9  Mountainview?

10  A  I do it on the track.

11  MR. STEPHENS: I have 12:15. Let's go off

12  the record for a second.

13  THE VIDEOGRAPHER: The time is now 12:17.

14  We are going off the record.

15  (Luncheon recess)

16  (Time noted: 12:17 p.m.)

17

18

19

20

21

22

23

24

25

131

1  AFTERNOON SESSION

2  (Time noted: 1:15 p.m.)

3  THE VIDEOGRAPHER: The time is now 1:15,

4  and this begins Tape No. 3 in the videotaped

5  deposition of Denis O'Leary.

6  BY MR. STEPHENS:

7  Q  Mr. O'Leary, let me just go back and ask a

8  couple of follow-up questions on a couple of the

9  other topics that we spoke about.

10  One of the things that we had talked about

11  was the discussion you had with Mr. Samenuk

12  regarding the 2000 focal grant?

13  A  Yes.

14  Q  And the first conversation occurred in

15  like the late May of 2006 time frame?

16  A  Right.

17  Q  Okay. After that conversation, did you

18  take any steps to secure any documents from

19  Mr. Samenuk that might relate to the handling of the

20  2001 option?

21  A  No.

22  Q  Okay. Did anyone you know take his

23  computer and mirror image the hard drive at that

24  point in time?

25  A  No.

132

1  Q  Was he denied access to any of McAfee's

2  computer databases following that discussion?

3  A  Well, I should say we did take steps

4  because when we did our investigation on options,

5  everyone was included, so we asked -- the scope of

6  the request that we asked internal audit and later

7  Gooding Howrey was to include everybody, every

8  option, ten years. We didn't give anyone a pass.

9  Q  Okay. But in late May of 2006 --

10  A  That was late May of --

11  Q  So to your knowledge --

12  A  We called Gooding Howrey the day we

13  became aware of Kent's event.

14  Q  Okay. That day, someone took Mr. Roberts'

15  laptop, correct?

16  A  Yes.

17  Q  That day, did anyone do anything to

18  preserve any documents for Mr. Samenuk?

19  A  Not that I know of.

20  Q  The following day, did anyone do anything

21  to preserve any documents from Mr. Samenuk?

22  A  Not that I know of.

23  Q  How about two or three days later?

24  A  I am not sure when people specifically

25  preserved documents for George, but from that day

O'Leary, Denis  1/9/2008  9:30:00 AM

189

1    questions.

2    A  Yes.

3    Q  You said you got downloads or updates

4    about the process that was being conducted, correct?

5    A  That's right.

6    Q  And in those updates or downloads, they

7    would -- folks would describe who the investigators

8    for the Special Committee was talking to or

9    interviewing?

10   A  No, not in detail.  Not really, no.

11   Q  Okay, but --

12   A  It was really -- quite honestly, I had

13   very little information other than the investigation

14   is continuing, that we have at this stage reviewed X

15   gazillion documents, and we have spoken to X amount

16   of people.  Occasionally, we might have heard who

17   they had spoken to, but nothing about what that

18   person said.

19   Q  Was there any discussion as to like how

20   they set the parameters of the fence?  By that, I

21   mean what was in the investigation, what was outside

22   the investigation?  Was there any investigation

23   about more stuff should be in, less stuff should be

24   in?

25   A  The general fence was discussed.  It

190

1    wasn't so much as discussed as shared with us, and

2    we agreed that it should go as far back as possible

3    right to the present date, that it should include --

4    be all inclusive on executives, both with us and who

5    had previously been with us, and should include

6    every option granted.

7    Q  Were you ever interviewed by any of the

8    attorneys at the Howrey law firm?

9    A  Yes, I was.

10   Q  Was that a face-to-face meeting?

11   A  Yes, it was.

12   Q  Where did that take place?

13   A  Santa Clara.

14   Q  How many times were you interviewed?

15   A  Once.

16   Q  How long was the interview?

17   A  Approximately, 30 minutes.

18   Q  Did you have any -- did you have anyone

19   with you during the interview?

20   A  No, it was -- I believe it was Roman

21   Darmer and Bob Gooding from Howrey, and I was alone,

22   me and myself.

23   Q  And in the interview, what information did

24   you provide?

25   A  They asked me about --

191

1    MR. STRICKLAND:  Let's not discuss what

2    they asked on the grounds that that is -- we are

3    going to take the position that that is privileged and

4    work product, but you can generally describe the

5    content of what was the meeting.

6    A  I discussed my initial option grant and my

7    recollection of how it was granted, my recollection

8    of who, if anyone, I talked to at that time, and the

9    level of awareness I had about it being dated a

10   different date than the actual board meeting.

11   Q  How did it go about this interview got

12   scheduled on -- who handled the scheduling?

13   A  Initially, I was made aware that there

14   were some director grants that had issues to them.

15   I also believe Bob Buckham may have been

16   present at that meeting with Howrey, also --

17   Q  Okay.

18   A  -- from the Special Committee, so it might

19   have been four of us, I can't recall now.  It was

20   definitely Roman, and Bob Gooding and myself.

21   Q  Okay.

22   A  Bob Buckham may have been sitting in on it

23   as well.  I believe Bob Buckham might have been the

24   one to tell me that Howrey would like to meet with

25   me and talk about my options.

192

1    Q  And that was prior to sitting down?

2    A  It was probably several days to a week

3    prior to sitting down.

4    Q  So -- I am sorry.

5    A  -- and then the meeting when we sat down

6    was commensurate with that board meeting.

7    Q  Okay.  All right.  Did Mr. Buckham tell

8    you anything else about the need for the

9    investigations from the Special Committee to talk to

10   you?

11   A  He told me that it looked like there was a

12   mispricing on my initial grant.

13   Q  Okay.

14   A  Which, to my recollection, was I didn't

15   think there was an error on it.

16   Q  What did you tell Mr. Buckham in response?

17   A  I said I thought my grant was right on the

18   money.

19   Q  Okay.

20   A  And so I was at a loss on what could be

21   erroneous.  I checked when I got it, I knew it was

22   25,000 shares, is what the Director of Comp was.  I

23   was Director of Comp.  I believe it was done at the

24   money and approved appropriately by the board, and I

25   acknowledged it.  I felt there was no room, why do

O'Leary, Denis  1/9/2008  9:30:00 AM

**205**

1  the outline of his remarks.
2      Q   All right.
3      A   All right.
4      Q   So it says that there is -- in some of the
5  resolutions following extensive discussion, the
6  board passed the following resolutions.  One of them
7  is the board accepting Mr. Samenuk's resignation; is
8  that accurate, that is what happened?
9      A   Yes.
10     Q   And then it talks about appointing some of
11 the directors, right?
12     A   That is right.
13     Q   Now, were you provided any guidance as to
14 the -- were you provided any guidance regarding how
15 to structure his separation agreement?
16     MR. STRICKLAND:  Object as ambiguous as to
17 timing.  He testified to some earlier.  Do you mean
18 something different or a different time frame?
19     Q   During this October 10th board meeting,
20 were you provided any guidance by anyone as to how
21 to structure the terms of Mr. Samenuk's separation
22 agreement?
23     A   Yes.
24     Q   By who?
25     A   We got advice from Wilson Sonsini,

**206**

1  particularly Jeff Saper.
2      MR. STRICKLAND:  Don't discuss the
3  content.
4      A   We asked for -- given what we had learned
5  at this meeting, we asked for advice on what our
6  options were and what would be appropriate actions
7  for a board in this situation.
8      MR. STEPHENS:  And then, Rod, so the
9  record is clear, my understanding is that you are
10 instructing the witness not to answer any questions
11 about the advice that Mr. Saper provided regarding
12 Mr. Samenuk's separation agreement at this board
13 meeting; is that right?
14     MR. STRICKLAND:  Correct.
15     BY MR. STEPHENS:
16     Q   Okay.  Is it the same answer for any of
17 the advice that the Howrey law firm provided
18 regarding the special investigation?
19     A   It would be, yes.
20     Q   Okay.
21     MR. STEPHENS:  All right.  So we obviously
22 disagree on that.
23     MR. STRICKLAND:  Yes, we do.
24     MR. STEPHENS:  As opposed to spending a
25 lot of time on the record, we will deal with it

**207**

1  later, fair?
2      MR. STRICKLAND:  Fair.
3      BY MR. STEPHENS:
4      Q   Okay.  The next one is Exhibit No. 63.
5      MR. STRICKLAND:  Okay.
6      Q   And this is a board meeting on
7  October 23rd, 2006.
8      So, Mr. O'Leary --
9      A   What was the last one?
10     MR. STRICKLAND:  This is 63, the last one
11 was 62.
12     THE WITNESS:  They are both minutes of the
13 same meeting?
14     MR. STRICKLAND:  No.  I am sorry.
15     THE WITNESS:  Okay, fine.  This is a
16 regular board meeting.
17     BY MR. STEPHENS:
18     Q   Mr. O'Leary, you should have in front of
19 you an exhibit marked 63, which is draft minutes of
20 a board meeting held on Monday, October 23rd, 2006,
21 at -- in New York.
22     A   That is correct.
23     Q   Is that what you have in front of you?
24     A   Yes, I do.
25     Q   Okay.  And you attended that meeting,

**208**

1  correct?
2      A   I did.
3      Q   And there was -- was this a meeting in
4  which the -- Mr. Gooding, on behalf of the Howrey
5  firm, provided or reported to the entire board about
6  the investigation?
7      A   I believe so.
8      Q   Okay.  Did he provide the board with any
9  written materials to review?
10     A   No, almost throughout this, other than a
11 board book saying "Special Committee Update," and I
12 have submitted the search on those pages, almost
13 zero was written or handed out.
14     Q   Have you ever seen any PowerPoint
15 presentation?
16     A   Yes, I have.
17     Q   Was there a PowerPoint presentation used
18 at this board meeting?
19     A   At this board meeting, I don't believe so.
20 There was one in the October board meeting.  I mean
21 the earlier October 10th meeting.
22     Q   Okay.  The really long one?
23     A   October 10th.
24     Q   And that board meeting took place in?
25     A   In Texas.

O'Leary, Denis  1/9/2008  9:30:00 AM

209

1    Q    In Texas?
2    A    Yes.
3    Q    So the record is clear, at the board
4    meeting on October 10th in Plano, Texas,
5    Mr. Howrey --
6    A    Bob Gooding.
7    Q    -- Mr. Gooding of the Howrey firm provided
8    or went through a PowerPoint presentation to the
9    board to describe kind of the scope of the work that
10   they had done, where they were in the investigation;
11   is that accurate?
12   A    And their findings.
13   Q    And their findings?
14   A    Scope, process, findings.
15   Q    So it is written down in a document, it is
16   just not written down in a document that was given
17   to you at the board meeting?
18   A    Correct.
19   Q    Have you ever seen a hard copy of that
20   document?
21   A    Yes, I have.
22   Q    When did you see a hard copy of that
23   document?
24   A    My belief, early summer of '07.
25   Q    In what context?

210

1    A    I had called Bob Gooding to say I would
2    like to reread the document that was presented to --
3    the PowerPoint that was presented to us in Texas.
4    Q    Okay.  Why?
5    A    Just because between the Texas date and
6    early this summer, it was clear there was going to
7    be a fair amount of litigation around those events
8    and also significant consequences pretty much
9    expected, but nonetheless significant, were going to
10   occur, and I wanted to reread it.
11   Q    Okay.  And Mr. Gooding supplied it to you?
12   A    I was offered the opportunity to visit
13   their offices in New York.  You are an attorney,
14   this is your world.
15   Q    Let me play this out.
16   A    I was offered the opportunity -- after
17   some discussion, it was decided that the best
18   approach was for me to visit their offices in New
19   York, sit in a room, and read the document and leave
20   the room without any notes or a copy of the
21   document.
22   Q    Were you allowed to take notes at the
23   meeting?  I am sorry, were you allowed to take notes
24   during your review of the report in the Howrey
25   firm's offices?

211

1    A    No one specifically sat there and watched
2    me, but the basic agreement was or the advice from
3    counsel would be reading it is the best approach.
4    Q    Okay.  So did you take notes?
5    A    No.
6    Q    Okay.  And you had the document there in
7    front of you --
8    A    Right.
9    Q    -- in the summer of 2007, at the law
10   offices of the Howrey firm here in New York?
11   A    That is right.
12   Q    And you provided it back to them and went
13   on your way?
14   A    I literally went in, an associate provided
15   me the document in the room.  I spent an hour or so
16   rereading the document.  I closed the document and
17   went outside, handed the document back to the
18   associate and said thank you very much.
19   Q    Was the -- PowerPoint slides usually have
20   page numbers on them.  Was this one numbered?
21   A    I don't recall.
22   Q    Okay.  Do you know if there were any gaps
23   in the document?
24   A    I don't recall.
25   Q    Would you have noticed if there was?

212

1    A    I think so.  When I left, it certainly
2    seemed to me they provided me the full presentation
3    I had seen previously in Texas.
4    Q    Okay.  At their presentation in Texas, was
5    there any comment from anybody that the PowerPoint
6    presentation that was being provided to you was only
7    a portion of the document and not the full
8    PowerPoint presentation?
9    A    No.
10   Q    You thought you had the full presentation,
11   correct?
12   A    It depends.  We thought we got the full
13   presentation that was intended for the full board.
14   Q    Right?
15   A    We didn't expect that we were going to see
16   the full scope of data.
17   Q    You are not going to get the 3 million
18   e-mails, right?
19   A    Or even the briefings that the Special
20   Committee got.  The purpose of the Special Committee
21   was to do all of that work and come to the core
22   findings that were appropriate for the board to
23   review and take action on it.  So my belief was that
24   the Special Committee had reviewed with Howrey a
25   document that would be presented to the full board

O'Leary, Denis  1/9/2008  9:30:00 AM

241

1     Did Mr. Roberts say to you that he didn't
2  believe he should be the legal counsel any longer
3  during that conversation?
4       MR. STEPHENS:  Object to form.
5     A  I don't recollect him saying that, no.
6     Q  What do you recall about that topic?
7     A  My recollection was that toward the end of
8  that discussion with him, he made some comments
9  referring to functions he could -- he could pursue
10  in the company other than general counsel, and that
11  I left the meeting with the distinct impression he
12  didn't realize he was going to be fired.
13       Q  Do you have a specific recollection that
14  during your conversation with Mr. Roberts, he
15  apologized to you for his actions in 2000?
16       MR. STEPHENS:  Object to form.
17     A  Absolutely.  Absolutely.
18       MR. COHEN:  I have no further questions.
19       MR. STEPHENS:  I have got no questions on
20  top of that, so from that -- from my perspective,
21  Mr. O'Leary, I thank you for taking the time today.
22       THE WITNESS:  Thank you.  Thank you,
23  gentlemen.
24       MR. COHEN:  I thank you as well.
25       THE VIDEOGRAPHER:  The time is now 3:44,.

242

1  and this concludes today's deposition of Denis
2  O'Leary on January 9th, 2008.
3       (The deposition concluded at 3:44 p.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

243

1
2
3       A C K N O W L E D G E M E N T
4       I, DENIS O'LEARY, hereby
5  certify, I have read the transcript of my
6  testimony taken under oath in my deposition
7  of January 9, 2008, that the transcript is
8  a true, complete and correct record of what
9  was asked, answered and said during this
10  deposition, and that the answers on the
11  record as given by me are true and correct.
12
13  _____
14       DENIS O'LEARY
15  Sworn and subscribed to before me
16  this_____day of_____, 2008.
17
18  _____
19       Notary Public
20
21
22
23
24
25

244

1       CERTIFICATE
2       OF
3       CERTIFIED SHORTHAND REPORTER
4       *   *   *
5
6       The undersigned Certified Shorthand
7  Reporter and Deposition Notary Public of the State
8  of New York do hereby certify:
9       That the foregoing Deposition was taken
10  before me at the time and place therein set forth,
11  at which time the Witness was duly sworn by me.
12       That the testimony of the Witness and all
13  objections made at the time of the Deposition
14  were recorded stenographically by me and were
15  thereafter transcribed, said transcript being a
16  true and correct copy of the proceedings thereof.
17       In witness whereof, I have subscribed
18  my name this date.  January 22, 2008.
19
20  _____
21       ANITA T. SHEMIN
22
23
24
25