UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE,<br><br>    Plaintiff,<br><br>  v.<br><br>KENT H. ROBERTS,<br><br>    Defendant.<br>_____ / | No. C 07-04580 MHP<br><br>**MEMORANDUM & ORDER**<br><br>**Re: Motion to Compel Production of Attorney Notes** |

      The Securities and Exchange Commission ("SEC") brought this action against Kent Roberts ("Roberts"), a former Executive Vice President of McAfee, Inc. ("McAfee"), for various securities laws violations. During the course of discovery, Roberts identified written notes held by third-party attorneys Howrey, LLP ("Howrey") that he contends are discoverable. Now before the court is Roberts' motion to compel production of these attorney notes. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court rules as follows.

BACKGROUND

      After allegations of stock option backdating, McAfee formed a Special Committee ("SC") of its Board of Directors ("Board"), comprising certain members of the Board, to conduct an internal investigation into the allegations. This SC hired Howrey to conduct the investigation. Howrey interviewed at least 75 people, including members of McAfee's Board, and based on its investigation, made Power Point presentations to McAfee's Board, the SEC, the Department of

Justice ("DOJ") and McAfee's former and current outside auditors.[1] During these presentations, Howrey discussed some of its findings and answered questions it was asked about the individuals it interviewed.

Based primarily on these presentations, Roberts now seeks three categories of documents: 1) Howrey's notes from the interviews it conducted; 2) notes of Howrey's meetings and communications with the government; and 3) notes of Howrey's communications with McAfee's management, Special Committee or the Board.

Howrey has provided Roberts in excess of 20,000 pages of documents, which constitute all of the relevant underlying source documents and emails that were analyzed in the course of its investigation, as well as the 236-page Power Point presentation made to the various third parties. In addition, Howrey has provided Roberts with a list of all the witnesses it interviewed as part of its investigation along with their contact information.

LEGAL STANDARD

I.   Scope of Discovery

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." Fed. R. Civ. P. 26(b)(1). The Rule goes on to state that "[f]or good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." Id. However, the broad scope of permissible discovery is limited by the attorney work product doctrine[2] and any relevant privileges, including the attorney-client privilege. See Fed. R. Civ. P. 26(b)(1), (3).

II.   Attorney-Client Privilege

The attorney-client privilege protects confidential communications by a client to an attorney made in order to obtain legal advice. The purpose of the attorney-client privilege is to encourage "full and frank communication between attorneys and their clients and thereby promote broader

2

1  public interests in the observance of law and the administration of justice." Upjohn Co. v. United
2  States, 449 U.S. 383, 389 (1981).
3        As a general matter, "[a] party is not entitled to discovery of information protected by the
4  attorney-client privilege." Navajo Nation v. Confederated Tribes & Bands of the Yakama Indian
5  Nation, 331 F.3d 1041, 1046 (9th Cir. 2003) (citing Wharton v. Calderon, 127 F.3d 1201, 1205 (9th
6  Cir. 1997)). However, the privilege is not absolute; it may be waived "either implicitly, by placing
7  privileged matters in controversy, or explicitly, by turning over privileged documents." Gomez v.
8  Vernon, 255 F.3d 1118, 1131 (9th Cir.), cert. denied, Beauclair v. Puente Gomez, 534 U.S. 1066
9  (2001). "The doctrine of waiver of the attorney-client privilege is rooted in notions of fundamental
10 fairness." Tennenbaum v. Deloitte & Touche, 77 F.3d 337, 340 (9th Cir. 1996). "Its principal
11 purpose is to protect against the unfairness that would result from a privilege holder selectively
12 disclosing privileged communications to an adversary, revealing those that support the cause while
13 claiming the shelter of the privilege to avoid disclosing those that are less favorable." Id. at 340–41
14 (citing 8 J. Wigmore, Evidence § 2327, at 636 (McNaughton rev. 1961)). Nonetheless, "the
15 disclosure of information resulting in the waiver of the attorney-client privilege constitutes waiver
16 'only as to communications about the matter actually disclosed.'" Chevron Corp. v. Pennzoil Co.,
17 974 F.2d 1156, 1162 (9th Cir. 1992) (quoting Weil v. Investment/Indicators, Research & Mgmt.,
18 Inc., 647 F.2d 18, 25 (9th Cir. 1981)).

19

20 III.    Work Product Doctrine
21       "The work product doctrine, codified in Federal Rule of Civil Procedure 26(b)(3), protects
22 'from discovery documents and tangible things prepared by a party or his representative in
23 anticipation of litigation.'" In re Grand Jury Subpoena, 357 F.3d 900, 906 (9th Cir. 2004) (quoting
24 Admiral Ins. Co. v. United States Dist. Court, 881 F.2d 1486, 1494 (9th Cir. 1989)).
25       The work product privilege is intended to promote a fair and efficient adversarial system by
26 protecting "the attorney's thought processes and legal recommendations" from the prying eyes of his
27 or her opponent. Genentech, Inc. v. United States Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed.
28 Cir. 1997) (citations omitted); accord Hickman v. Taylor, 329 U.S. 495, 511–14 (1947) ("Proper

3

preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference . . . Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten . . . .").

Work product may be subject to disclosure upon an adverse party's showing of "substantial need for the materials and undue hardship in obtaining the substantial equivalent of the materials by other means." Grand Jury Subpoena, 357 F.3d at 906 (quoting Fed. R. Civ. P. 26 (b)(3)) (internal alterations and quotations omitted). However, "opinion work product," which includes the "mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation" is subject to a different standard. Fed. R. Civ. P. 26(b)(3)(B). Under Ninth Circuit law, such opinion work product is discoverable only if it is "*at issue* in the case and the need for the material is compelling." Holmgren v. State Farm Mut. Auto. Ins. Co., 976 F.2d 573, 577 (9th Cir. 1992) ("[a] party seeking opinion work product must make a showing beyond the substantial need/undue hardship test required under Rule 26(b)(3) for non-opinion work product."). However, like the attorney-client privilege, protection for attorney work product may be waived by disclosure or by other conduct, such as the testimonial use of the materials. United States v. Nobles, 422 U.S. 225, 239–40 (1975).

DISCUSSION

Roberts seeks three categories of documents: 1) Howrey's interview notes; 2) notes of Howrey's meetings and communications with the government; and 3) notes of communications between Howrey and McAfee's management, Special Committee or the Board. Each is discussed in turn.

I.   Interview Notes

Analysis of this issue requires a methodical approach. The court will first discuss in detail what information was disclosed by Howrey to third parties other than the SC. Then, based upon the information disclosed, the court will determine if the disclosure led to a waiver. If there was a

4

waiver, then the court will determine the scope of this waiver. If there was no waiver, the court will determine if the documents in question should nonetheless be produced to Roberts because of a substantial need and undue hardship.

### A. Disclosures to McAfee's Board and Governmental Agencies

There is no dispute that the interview notes in question here are classic attorney work product—they comprise handwritten notes that include the attorney's mental impressions, conclusions and opinions. Roberts claims these documents were disclosed by Howrey to third parties.

#### 1. Instances of Purported Waiver

Howrey made at least three presentations to McAfee's Board that may have disclosed the contents of the interview notes in question.

The June 30, 2006 meeting minutes state:

> Mr. Gooding [attorney of the Howrey firm and counsel to the SC] updated the Board on the latest SEC/DOJ call centering on the Kent Roberts issues. He noted that several documents discovered with regard to the April 2000 Roberts option grant had been forwarded to the SEC and a subsequent call was conducted related to those documents. Mr. Gooding conveyed to them his impressions of our software system and its limitations, updated them on the progress of our investigation, status of documents and e-mail review and anticipated timing of completion.

Freeman Dec., Exh. J at 1. There is no other evidence that the Howrey attorneys revealed their mental impressions or conclusions regarding the interviews at the June 30, 2006 meeting. The court does note that the documents that Howrey provided to the government or the Board have lost whatever privileged character they may once have had.[3]

During the week of the July Board meeting, Howrey attorneys also met separately with Board member Denis O'Leary to inform him of potential problems with his options. Id., Exh. M at 128:9–129:18, 190:23–192:18 (deposition of Denis O'Leary). There is, however, no evidence that Howrey attorneys revealed their mental impressions or conclusions regarding the interview notes.

On October 10, 2006 Howrey made another presentation to McAfee's Board. The relevant meeting minutes state:

> Ms [sic] Troe then detailed for the Board the various stock option issues, improprieties and erroneous option grant dates that were discovered in the

5

>     investigation. Ms [sic] Troe reviewed the probable scope of the compensations charges associated with these stock option grant issues.
>
>     Mr. Gooding and Ms. Troe discussed various remedial measures that would be recommended as a result of the investigation.
>     . . .
>     Mr. Gooding then detailed various option grant issues that involved participation of Company management personnel, including Mr. Samenuk and Kevin Weiss, the Company's President.

Id., Exh. F at 2.

Denis O'Leary, an attendee at the October 10 Board meeting testified that:

>     Q: So the record is clear, at the board meeting on October 10th in Plano, Texas, Mr. Howrey –
>     A: Bob Gooding
>     Q: – Mr. Gooding of the Howrey firm provided or went through a PowerPoint presentation to the board to describe kind of the scope of the work that they had done, where they were in the investigation; is that accurate?
>     A: And their findings.
>     Q: And their findings?
>     A: Scope, process, findings.

Id., Exh. M at 209:3–14. This vague statement merely confirms the above. Specifically, neither it nor the meeting minutes demonstrate that the Howrey attorneys revealed their mental impressions or conclusions regarding the interviews.

On October 23, 2006 Howrey made another presentation to Howrey's Board of Directors. The relevant meeting minutes state:

>     Mr. Gooding distributed an executive summary of the Special Committee's preliminary findings from its investigation. Mr. Gooding then discussed with the Board various proposed remedial measures which were recommended as an outgrowth of his firm's independent investigation . . . .
>     . . .
>     Mr. Gooding then discussed with the Board various recommendations he had in regards to the need for additional experienced personnel in the Company's legal, stock administration, and internal audit departments.

Id., Exh. K at 1. Again, this does not present evidence of disclosure of mental impressions or opinions.

With respect to the government, Robert E. Gooding, Jr. of the Howrey firm testified that the "substance" of the information conveyed in the witness interviews was disclosed orally to the government.

>     Q: Was the substance of information conveyed in the interview relayed to the government?
>     A: Yes

6

> Q: Would that be true not just for Mr. Weiss, but also for others?
> A: Yes
> Q: So it was conveyed orally?
> A: Yes
> Q: Were you present when that was conveyed to the SEC?
> A: Yes
> Q: As it pertains to Mr. Weiss, what information was conveyed to the SEC?
> A: Well, it was essentially the same Power Point presentation that we had made to the board of directors.

Freeman Dec., Exh. D at 54:3–17; see also id. 154:15–25, 155:10–14 (substance of the interview notes with respect to Weiss, Samenuk and Garcia-Lechelt interviews were disclosed to the government). The relevant question here is the scope of the word "substance." There is no evidence that substance includes the attorneys' mental impressions and conclusions. Thus, the court agrees with Howrey's assertion that "substance" could be and should be limited to the factual information provided to the government or the Board in response to their questions about what was said by particular witnesses.

### 2. Applicable Law

In United States v. Reyes, 239 F.R.D. 591 (N.D. Cal. 2006) (Breyer, J.), a former CEO was indicted and he sought very similar information under similar circumstances in a criminal matter. There, a corporation's audit committee had launched an internal investigation in anticipation of litigation. The audit committee sought the assistance of two law firms, Morrison & Foerster and Wilson Sonsini Goodrich & Rosati. Id. at 596. "[A]t the direction of their mutual client, Brocade's Audit Committee," both law firms "conferred with each other about their findings and both agreed to meet with officials from the [SEC] and the [DOJ]." Id. During these meetings:

> The law firms did not provide the government with any written material, though both prepared notes and memoranda in preparation for the meetings. Instead, the MoFo attorneys provided the government with only oral briefings *on their interviews* and findings. Meanwhile, WSG & R provided briefings, as well as a multimedia presentation.

Id. (citations omitted) (emphasis added). The Reyes court held that any privileges that had attached were waived. Judge Breyer found that:

> MoFo and WSG & R gave up their work-product privilege when they shared the substance of their work product with the government. First, MoFo and WSG & R employed their confidential communications and their work product for testimonial and evidentiary purposes. Though not used in a formal legal proceeding, their aim in disclosing the information was to share evidence and opinions about Brocade's backdating scandal with the very law-enforcement officials with power to punish the

7

> underlying conduct. The use of privileged material in such a capacity generally constitutes a waiver.

Id. at 603. Based in part on this finding, the court held:

> *To the extent* that MoFo and WSG & R disclosed to the government information contained in any of the written material identified in Reyes' subpoenas, the Court holds that the law firms have waived any right to protect it under the attorney-client or work-product privileges.

Id. at 604 (emphasis added). The court then ordered *in camera* production of the notes not because of privilege or Sixth Amendment concerns but because the materials needed to be both relevant and admissible to be producible under the appropriate rule of criminal procedure. No such considerations regarding the Sixth Amendment or admissibility attach to the current request for production.

The analysis in Reyes is instructive. The court agrees that "the transmission of privileged information is what matters, not the medium through which it is conveyed." Id. Indeed, to the extent that Howrey orally disclosed to the government factual information contained in any of the written material identified by Roberts, Howrey has waived the attorney-client and work product privileges with respect to that information.

Howrey's arguments to the contrary are unpersuasive. First, the Reyes court found waiver without balancing the same against the Sixth Amendment right to counsel and confrontation of witnesses. Second, the fact that Roberts may depose the interviewees here is irrelevant to whether the privilege was waived. Third, *in camera* inspection was ordered by the court there only because the interview notes were not necessarily admissible and admissibility was required for the production of the notes in that criminal matter.

Along the same vein, the court also agrees with the conclusion reached in United States v. Bergonzi, 216 F.R.D. 487 (N.D. Cal. 2003) (Jenkins, J.). In Bergonzi, the court held that the defendant corporation and the government did not share a common interest and consequently, the privilege with respect to the report and back-up materials that were provided to the SEC and the United States Attorney's Office had been waived. Id. at 498. But see In re McKesson HBOC, Inc. Sec. Litig., 2005 WL 934331, at *9 (N.D. Cal. Mar. 31, 2005) (Whyte, J) (holding that confidentiality agreements between the corporation and the government precluded waiver of the

8

privilege).  Howrey does not argue that the McAfee's Special Committee has a common interest with that of the government.  Consequently, the cases discussing the common interest doctrine in that context are inapposite.  Here, there is no question that a waiver has been effectuated with respect to the factual information actually provided to the government or the Board.  Thus, to the extent that factual information was provided to the government or the Board in response to questioning, those facts must be disclosed to Roberts.[4]

Roberts also relies upon <u>Reyes</u> along with the Second Circuit to support his position that selective waivers are unacceptable.

> Petitioner alleges that a denial of the petition [for mandamus] will present those in similar situations with a Hobson's choice between waiving work product protection through cooperation with investigatory authorities, or not cooperating with the authorities.  Whether characterized as forcing a party in between a Scylla and Charybdis, a rock and a hard place, or some other tired but equally evocative metaphoric cliché, the 'Hobson's choice' argument is unpersuasive given the facts of this case.  An allegation that a party facing a federal investigation and the prospect of a civil fraud suit must make difficult choices is insufficient justification for carving a substantial exception to the waiver doctrine.

<u>In re Steinhardt Partners, L.P.</u>, 9 F.3d 230, 236 (2d Cir. 1993).  The court agrees that generally, Howrey may not selectively disclose information to third parties while continuing to maintain the privilege against Roberts.  <u>See</u> <u>Reyes</u>, 239 F.R.D. at 603.  However, because of the court's finding below that no waiver occurred here, it does not reach the question of whether the privileges ought to be maintained because a governmental investigation is akin to a coercive release of privileged information.  <u>See, e.g.</u>, <u>Regents of the Univ. of California v. Superior Court</u>, 165 Cal. App. 4th 672 (2008) (under California Evidence Code section 912(a), "when privileged documents have been disclosed either in response to the request of a government agency or inadvertently in the course of civil discovery, no waiver of the privilege will occur if the holder of the privilege has taken reasonable steps under the circumstances to prevent disclosure. The law does not require that the holder of the privilege take 'strenuous or Herculean efforts' to resist disclosure.").[5]

        3.    <u>Analysis</u>

Certain instances of waiver are straightforward.  When Howrey "detailed for the Board the various stock option issues, improprieties and erroneous option grant dates that were discovered in

9

1  the investigation," Freeman Dec., Exh. F at 2, it waived the work product privilege with respect to
2  its conclusions regarding which option grant dates were improper or erroneous.

3        When either privilege is waived, its scope extends to "all communications on the same
4  subject matter . . . so that a party is prevented from disclosing communications that support its
5  position while simultaneously concealing communications that do not." Stanford v. Roche, 237
6  F.R.D. 618, 625 (N. D. Cal. 2006) (Patel, J.). This court has further stated that "[t]here is no bright
7  line test for determining what constitutes the subject matter of a waiver, rather courts weigh the
8  circumstances of the disclosure, the nature of the legal advice sought and the prejudice to the parties
9  of permitting or prohibiting further disclosures." Id.

10        The scope of the disclosure here simply does not extend to the interview notes since, as
11  discussed below, there is no evidence that the substance of the interviews or Howrey's work product
12  were mentioned by Howrey during the Board meetings. The nature of the legal advice sought here
13  were Howrey's conclusions and revelation of the same does not effectuate a carte blanche waiver.
14  Further, there is no evidence that certain favorable communications were released. Thus, to the
15  extent that Howrey has not disclosed to Roberts the "improprieties and erroneous option grant dates
16  that were discovered in the litigation," it must do so. Similarly, Howrey must also disclose the
17  various "remedial measures" it recommended and the "executive summary of the Special
18  Committee's preliminary findings from its investigation." Freeman Dec., Exh. K at 1.

19        The court now turns to whether the information orally provided effectuated a waiver, and if
20  so, the scope of the waiver. In this respect, the court finds Reyes and similar cases factually
21  distinguishable. In Reyes, the privilege holder had provided the government with oral briefing "on
22  their interviews and findings." 239 F.R.D. at 596. As discussed below, there is no evidence that the
23  attorneys' mental impressions and conclusions regarding the interviews were provided to the
24  government or the Board. Further, Steinhardt, 9 F.3d 230, is also distinguishable. There, counsel
25  prepared and submitted a memorandum and accompanying exhibits to the SEC, which the court
26  ordered produced. Here, all physical documents provided to third parties have already been
27  provided to Roberts.
28

10

Howrey vehemently maintains that other than the documentary disclosures made during the presentations, Howrey's oral disclosures were limited to confirming specific factual information contained in the PowerPoint presentation or underlying source documents, as well as responding to specific questions about what certain witnesses said about those non-privileged documents. It contends the answers regarding the witnesses were limited to facts and did not reveal the attorneys' thoughts or mental impressions. Specifically, it contends the presentation described the scope and methodology of the investigation while highlighting key unprivileged documents and emails to set forth the underlying facts regarding problematic stock option grants. It states:

> [t]he PowerPoint did not contain findings, conclusions, opinions or legal theories of Howrey or any excerpts or summaries from the interview notes. Instead, it set forth the underlying *facts* with respect to a number of problematic transactions in which it appeared that misdating or backdating of stock options grants may have occurred, with the expectation that the Board would reach its own conclusions and take whatever corrective personnel actions or other remedial actions it deemed necessary.

Opp. at 4–5. Indeed, other than the Board meeting minutes outlined above there is no evidence of Howrey conclusions and analysis being revealed. Further, the fact that Howrey took meticulous precautions to create a presentation based only on non-privileged documents lends credibility to Howrey's assertion.[6]

Nevertheless, Howrey did answer the Board's and the government's questions during the presentations as to what certain witnesses said during their interview. Howrey claims to have done so without referring to the notes, reviewing them prior to the presentation or bringing the notes to the presentation. There is evidence, however, that Howrey attorneys referred to their interview notes prior to some other communications with the government. There is evidence of this with respect to at least four witnesses. Specifically, Howrey released to the government "documents [it] used with Snook that relate to Terry Davis." Freeman Dec., Exh. N at SEC-ROBERTS-HOWREY 000777. Further, Howrey attorneys referred to the interview notes when answering the government's questions. Specifically, they verified certain factual information regarding what the witnesses Radke, Snook and Koopman had told the Howrey attorneys. Id.; see also id., Exh. O at 65:18–22 (David Bartels, a Howrey attorney, testifying that Howrey attorneys sometimes referred to their interview notes to prepare for the meetings with the government). The information disclosed in the e-mails regarding Radke, Snook and Koopman, however, only disclose the witness' factual

11

assertions, not the attorneys' mental impressions or conclusions. Indeed, there is no evidence that Howrey volunteered the substance of its impressions and opinions regarding the witness interviews. It simply answered factual questions posed by the government regarding the witnesses.

Thus, Roberts' argument hinges on his assertion that Howrey's discussions with the government and the Board *must have* included Howrey's conclusions and analysis regarding the raw data in the presentation. In support, he cites Howrey's statement that it "responded to questions from the government [and others] as to what certain individuals had said about particular issues during the course of their interviews." Opp. at 5. Further, it argues that this extensive investigation that cost McAfee millions of dollars must have led to some "conclusions about who did what, and with what state of mind, because, among other things, the McAfee board, after hearing a download from Howrey, asked the company's CEO, George Samenuk, to resign and fired its President, Kevin Weiss." Motion at 11–12. The court agrees with Roberts' assertion that Howrey "was paid to *analyze*, to *make connections* between disparate pieces of data in a complex mosaic, and to *reach conclusions*." Id. at 12.

Robert's conclusion that mental impressions must have been revealed is not foregone. Although it is possible, arguably even likely, that Howrey revealed its mental impressions and conclusions during its communications, Roberts simply has not presented evidence of the same. Indeed, it is just as likely, as Howrey argues, that Howrey simply presented the evidence and allowed the Board members to connect the dots themselves.

Here, factors weighing in favor of disclosure are: 1) reference to the interview notes before releasing factual information to the government; 2) an "admission" that the substance of the interviews was disclosed; and 3) alleged disclosure, without evidentiary support, of the attorneys' conclusions and analysis during the multiple presentations made by Howrey's attorneys where they discussed improprieties and erroneous option grants. On the other hand, factors weighing against disclosure are: 1) when questioned, Howrey attorneys only revealed specific facts from the interviews, not their mental impressions and opinions nor did they reveal the questions asked of the witnesses and answers given; 2) reference to the interview notes were made only to confirm or deny facts; 3) the vagueness of the purported admission; 4) the attenuated nature of the attorneys'

12

conclusions from their interview notes; 5) the availability of the witnesses to Mr. Roberts to interview for himself; and 6) disclosure, if any, was indirect. Weighing the circumstances, the court does not find a waiver of the privileges with respect to meeting notes pertaining to individuals for whom there is no evidence of disclosure.

Similarly, with respect to the specific interviewees referenced in the e-mails between Howrey and third parties, Howrey has not waived the work product privilege that had attached to those meeting notes. Only factual information was revealed, and only upon questioning by the government. Howrey did not volunteer information about the questions it asked the witnesses, which could reveal the Howrey attorneys' mental impressions and conclusions. Thus, the court finds that even if Howrey referred to interview notes during communications with the government, the reference does not automatically constitute a waiver. Specifically, release of factual information from the meeting notes, when queried by the government, does not reveal mental impressions or conclusions.

The court does find one instance where the attorneys' mental impressions and conclusions were revealed to a third party. In Robert E. Gooding's deposition conducted on September 13, 2007, he revealed his impressions of some witness' demeanor, credibility and culpability. Eagan Dec., Exh. A at 94:19–95:6, 97:7–14, 103:6–8, 104:12-23 (discussing Ms. Garcia-Lechelt's inconsistencies and adamance, Mr. Weiss' surprise upon viewing an e-mail and Mr. Samenuk's lack of credibility). In light of these disclosures, which effect a waiver, the court finds that all interview notes and summaries with respect to Garcia-Lechelt, Weiss and Samenuk must be provided to Roberts. The court notes that disclosure of mental impressions and conclusions with respect to some witnesses does not require that witness notes with respect to all witnesses be disclosed. Although a subject matter waiver is effectuated by the disclosure, the scope of the subject matter does not extend to all witnesses. The court holds that the subject matter with respect to disclosure about a particular interviewee are the notes with respect to that interviewee only. There is no evidence here that Howrey is attempting to use disclosure as a sword because these witnesses will provide evidence favorable to Howrey. Indeed, Howrey is not even a party to this litigation. Further, using this scope for waiver precludes the Special Committee or its attorneys from using an interviewee's

13

statements as a sword by only partially releasing its mental impressions and conclusions with respect to a particular interviewee.

### B. Disclosures to Current and Former Auditors

In addition to presenting the aforementioned Power Point presentation to McAfee's prior and current auditors and answering the auditors' questions about what certain witnesses had said in the course of their interviews, Howrey also responded to the auditors' questions regarding "dirty" or "clean" current or former employees. Specifically, Howrey represented to its current and former auditors that:

> The scope and results of our investigation of any qualitative materiality issue has been provided to the Special Committee, the Board, the Enforcement Staff of the Securities and Exchange Commission, relevant personnel at the Department of Justice, and to you.
>
> Specifically, on October 6, 2006, we provided you with the details of any options-related transactions that, in our view, presented qualitative materiality issues or potentially improper conduct, including identification of individuals who were involved. Beginning on February 26, 2007, we provided to you orally the substance of all interviews that we conducted. We are prepared to provide you orally with our conclusions as to the conduct of each of the interviewees in terms of the qualitative characterizations you have indicated. No information relating to the Special Committee's investigation of any issue has been withheld from PricewaterhouseCoopers or Deloitte & Touche on the basis of the attorney-client privilege, work product privilege, or any other privilege.

Freeman Dec., Exh. E at 3. Upon the auditors' request, Howrey then characterized the interviewees as either "dirty" or "clean." There can be no serious argument that Howrey disclosed its mental impressions, opinions and conclusions through this characterization. Indeed, the "dirty" or "clean" label is a conclusion based on the attorneys' opinions and analysis of the evidence. Further, the interviews with the current and former employees and the attorneys' opinions and conclusions from those interviews would have been integral to reaching a conclusion.

Howrey claims that the common interest doctrine attaches here, thereby precluding a finding of waiver for information revealed to the auditors. Merrill Lynch & Co. v. Allegheny Energy, Inc., 229 F.R.D. 441, 446–47 (S.D.N.Y. 2004), which found no waiver based on the view that the auditor was not an "adversary or a conduit to a potential adversary," is directly on point. Specifically, the court found no waiver because the tension resulting from the auditor's need to investigate company

14

records did not amount to actual adversity. Id. at 448. However, there is a split of authority on this issue. In Medinol, Ltd. v. Boston Scientific Corp., 214 F.R.D. 113, 116 (S.D.N.Y. 2002), the court found a waiver because the auditor necessarily performed an "independent watchdog" function. See also Samuels v. Mitchell, 155 F.R.D. 195, 200 (N.D. Cal. 1994) (Infante, Mag. J.) (finding that disclosure to the auditor did not further any litigation interest of the disclosing party); Diasonics Sec. Litig., 1986 WL 53402 (N.D. Cal. June 15, 1986) (Woelflen, Mag. J.) (same).

This court agrees with the Merrill Lynch court for the reasons stated therein. Specifically,

> [A]ny tension between an auditor and a corporation that arises from an auditor's need to scrutinize and investigate a corporation's records and bookkeeping practices simply is not the equivalent of an adversarial relationship contemplated by the work product doctrine. Nor should it be. A business and its auditor can and should be aligned insofar as they both seek to prevent, detect, and root out corporate fraud. Indeed, this is precisely the type of limited alliance that courts should encourage. For example, here Merrill Lynch complied with [the auditors'] request for copies of the internal investigation reports so that the auditors could further assess Merrill Lynch's internal controls, both to inform its audit work and to notify the corporation if there was a deficiency.

Id. at 448. Similarly, here the auditors asked for certain qualitative conclusions to aid them in performing their audit work.

Furthermore, this court finds that its holding furthers the strong public policy of encouraging critical self-policing by corporations. Indeed, sanctioning a broad wavier here would have a chilling effect on the corporation's efforts to root out and prevent corporate fraud and disclose the results as necessary to its auditors.

Roberts' various arguments to the contrary are unpersuasive. First, the amount of privileged information disclosed to the auditors is irrelevant if the auditor is found not be an adversary or a conduit to a potential adversary. Second, disclosure to other parties is irrelevant to analyze the relationship between the auditors and McAfee's Special Committee. Third, the fact that auditors have incentives to demonstrate that their clients had deceived them in light of potential litigation against the auditors does not undercut their fiduciary duty to their client, which requires them to advise their client to restate its financial statements in light of the discovery of wrongdoings. In this respect, the Special Committee and the auditors have a common goal—correct past wrongdoings that occurred at McAfee—and a common body whose interests they represent—the shareholders of

15

McAfee. Thus, not only do they not have an adversarial relationship, the auditors and the Special Committee have aligned interests. See id. at 446-47 (distinguishing Medinol on the basis that waiver focuses on existence of adversarial relationship, not alignment of interests).

In sum, any disclosures made to the auditors does not amount to a waiver as their assistance is necessary for Howrey to properly conduct its investigation and for McAfee to restate its financial statements.

### C.  Substantial Need

In the alternative, Roberts requests disclosure of the documents based on substantial need. Roberts claims substantial need exists because these documents are relevant to whether he committed the acts with which he is charged, his state of mind and his ability to impeach key witnesses against him. Specifically, he claims the information may demonstrate McAfee frequently repriced option grants and that it was McAfee's controller that did so, which led Mr. Roberts to believe such modification was common and acceptable. He further claims the attorney's notes will help him determine individuals with knowledge of McAfee's accounting practices and determine the credibility of key witnesses. However, Roberts has not demonstrated why he cannot depose the witnesses himself. Roberts has not shown that any of the witnesses are unavailable or will assert their Fifth Amendment rights. Roberts is free to ask the witnesses what they knew and when they knew it and the witnesses may not claim that what they told the Howrey attorneys is protected by any privilege. Thus, a substantial need for the interview notes has not been shown. In light of this decision, Roberts is free to petition this court to increase the number of depositions he may conduct.[7] Further, Roberts has shown absolutely no need for the attorney opinions and conclusions intertwined in the interview notes.

### D.  Disclosure of Facts Contained in the Meeting Notes

In the alternative, Roberts also seeks disclosure of the factual information contained within the interview notes. Howrey concedes it disclosed the factual information contained therein to third parties. In any event, the court is aware of no privilege that protects the factual information

16

contained within the notes. However, the situation here is essentially indistinguishable from the situation in the seminal case on the attorney work product doctrine. See Hickman, 329 U.S. 495. As the Court there stated:

> Here is simply an attempt, without purported necessity or justification, to secure written statements, private memoranda and personal recollections prepared or formed by an adverse party's counsel in the course of his legal duties. As such, it falls outside the arena of discovery and contravenes the public policy underlying the orderly prosecution and defense of legal claims. Not even the most liberal of discovery theories can justify unwarranted inquiries into the files and the mental impressions of an attorney.

Id. at 509–10. Indeed, the facts contained within the notes are likely inextricably tied with the attorneys' mental thoughts and impressions. The court is aware that revelation of all the purely factual assertions elicited from an interviewee may reveal the questions asked and therefore the attorneys' mental impressions and conclusions. Consequently, without a greater showing of need, the court does not find that all the facts contained within the interview notes need be disclosed.

II.  Notes of Meetings and other Communications with the Government

Howrey has offered to produce these notes, subject only to redaction necessary to protect the mental impressions of the attorneys or other work product. In light of the fact that the notes themselves are work product privileged and may contain the attorneys' mental impressions, conclusions and opinions, the court finds this solution acceptable.

III. Notes of Communications Between Howrey and McAfee's Management, Audit Committee or the Board

The notes with respect to communications between Howrey and the Special Committee are protected by the attorney-client privilege and thus need not be provided.

The notes with respect to communications between Howrey and the Board or members of the Board that are not members of the Special Committee are not protected by the attorney-client privilege since they are not with respect to communications between Howrey and its client, the Special Committee of the Board. The notes, however, are attorney work product and consequently may contain the attorneys' mental impressions and conclusions. Nevertheless, the concern the court

17

had above with respect to the interviewee's answers revealing the question asked of the interviewee is not present here. Specifically, the factual information contained within these notes is unlikely to be inextricably intertwined with the attorneys' mental impressions and conclusions. Since there is no other feasible way for Roberts to gather this information, these notes must be provided subject to the redaction necessary to protect the mental impressions and conclusions of the attorneys.

CONCLUSION

For the foregoing reasons, Roberts' Motion to Compel is DENIED in part and GRANTED in part. Specifically, Howrey is ordered to provide the following: 1) all documents provided or made available to the government or the Board; 2) all factual information disclosed to the government or the Board in response to their questioning regarding statements made by the various individuals interviewed by Howrey; 3) all interview notes with respect to the interviews of Garcia-Lechelt, Weiss and Samenuk; and 4) notes of meetings or communications with the government, the full Board and any McAfee Board members that are not members of the Special Committee, subject to redaction to protect the attorneys' mental impressions and conclusions.

IT IS SO ORDERED.

Dated: August 22, 2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

**ENDNOTES**

1.   Howrey also met with, but did not make a presentation to, attorneys representing plaintiffs in a derivative action against McAfee.

2.   The court recognizes that the work-product doctrine is not an evidentiary "privilege," <u>Admiral Ins. Co. v. United States Dist. Court</u>, 881 F.2d 1486, 1494 (9th Cir. 1989), but may at times refer to it as such for convenience.

3.   Even though the actual conversations or communications between Howrey and the SEC or DOJ are not privileged, if attorney notes about the communications exist, that work product privileged document will be treated in the same manner as the witness notes at issue here.

4.   The court notes that not only is the Board not Howrey's client such that the attorney-client privilege does not attach, the Board also does not have a common interest with the Special Committee since it was the Special Committee's mandate to ascertain whether members of the Board that may have engaged in wrongdoing.  In this respect, this court disagrees with the conclusion reached in <u>In Re BCE West, L.P.</u>, No. M-8-85, 2000 WL 1239117 (S.D.N.Y. Aug. 31, 2000).

5.   Howrey makes no argument that the governmental agencies involved here share a common interest with its client, the Special Committee of the Board.

6.   Howrey makes much of the fact that it has never physically provided the interview notes to anybody.  However, it is irrelevant that the physical notes were never handed over if the attorneys' mental impressions and conclusions were made known to third parties.

7.   Howrey has instructed witnesses not to answer questions posed to witnesses regarding their earlier interview with Howrey attorneys.  The conversations themselves are not protected by either the attorney-client or the work product privilege and therefore that instruction is unwarranted.